EDDERY v. INTERBOROUGH RAPID TRANSIT CO.

(Supreme Court, Appellate Division, Second Department.  May 9, 1912.)

1. MASTER AND SERVANT (§ 125*)—INJURY TO SERVANT—NEGLIGENCE—EVI-
   DENCE.

   Where a trackwalker of an elevated railroad company used a tempora-
   ry passage over an opening incidental to the unfinished work of an inde-
   pendent contractor engaged in lowering the structure, and was killed by
   falling through the opening into the street by the turning of a plank on
   which he stepped, but the way used was not adopted by the company for
   the use of its servants in the discharge of their service, the liability of
   the company depended on whether it knew of the use of the temporary
   passage by its servants, or, in the exercise of due care, ought to have
   known it.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 243–
   251; Dec. Dig. § 125.*]

2. MASTER AND SERVANT (§ 125*)—KNOWLEDGE OF MASTER—EVIDENCE.

   The knowledge of a servant of the use of a structure by a coservant is
   not imputable to the master.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§
   243–251; Dec. Dig. § 125.*]

3. MASTER AND SERVANT (§ 278*)—INJURY TO SERVANT—DEFECTIVE STRUC-
   TURES—EVIDENCE.

   A trackwalker of an elevated railroad company used a temporary pas-
   sage over an opening incidental to the unfinished work of an independent
   contractor in lowering the structure, and fell through into the street by
   a plank on which he stepped turning.  There was no evidence that track-
   walkers when in the discharge of their duties as such were accustomed to
   use the temporary passage.  *Held*, that the company was not liable on
   the theory that it ought to have known of the use of the temporary pas-
   sage by its employés.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954–
   972, 977; Dec. Dig. § 278.*]

Appeal from Trial Term, Westchester County.

Action by Mary Eddery, administratrix of Andrew Eddery, de-
ceased, against the Interborough Rapid Transit Company.  From a
judgment for plaintiff and from an order denying a new trial, de-
fendant appeals.  Reversed, and new trial granted.

Argued before JENKS, P. J., and HIRSCHBERG, THOMAS,
BURR, and CARR, JJ.

Ambrose F. McCabe, of New York City, for appellant.

Thomas J. O'Neill, of New York City, for respondent.

JENKS, P. J.  This action is brought by the administrator of a
servant against a master for negligence.  The defendant worked a
railroad elevated upon a structure in the city of New York.  About
11 p. m. of January 7, 1910, the servant was found dead in the street
beneath that fabric.  The sole witness of the casualty, a watchman
in that street, saw this servant move along the structure with a lan-
tern, and then step upon a plank, when the plank turned, and the
servant fell through an opening into the street.  For some months
before, and at this time, an independent contractor was lowering the
structure, so that it would pass under the line of the Manhattan

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Bridge. In that work a new structure was building beneath the old, and gradually rising from Manhattan Bridge toward Chatham Square had reached a point about 200 feet east of Chatham Square, and 2½ to 4 feet below the level of the old structure. The trains ran only on the north and the south sides of the old structure. A third track and the ties between the north and the south tracks had been so far removed that an open space from 5½ to 8 feet wide was left between the ties remaining between the north and the south tracks of the old structure and the westerly end of the new. This gap extended from the north-bound track to the south-bound track, a distance of from 15 to 18 feet. It was not of the permanent structure, but was temporary and incidental to the unfinished work. On the night of the accident there were two planks across this opening, each 12 feet long, 1½ to 2 inches thick, and 1 foot wide, which slanted up from the new structure to the old. The night supervisor of the defendant testified that they had been put there for the day men, who worked on construction in case they wished to pass from the new to the old structure—"in case they wanted to go to Chatham Square Station." The plaintiff's witness Sullivan, a former flagman of the defendant, testifies that they used to cover the hole "much more" with boards, sometimes completely, but that two weeks before the accident it was not completely covered, and that for three or four days before the accident, so far as he knew, there were but two planks.

The testimony of the defendant's track supervisor, of its night supervisor, and of its foreman of the trackmen is that the servant, a trackwalker, had no duties whatever which called him to go upon the new structure. And there is evidence that a trackwalker's duty was to walk between the tracks to see that they were safe. Sullivan did testify that a trackwalker must necessarily step upon the planks in case of the coming of a train, but admitted that it was at least six feet from the tracks to the planks; and the testimony of several witnesses called by the defendant indicates that those walking in the tracks avoided oncoming trains by standing upon a girder which was nearly two feet wide, so that I think that there was not sufficient evidence to support the conclusion that a trackwalker, in order to avoid a train, was compelled or accustomed to go upon these planks. But, in any event, there is no evidence that, when the servant took this course, there was any train approaching on the track in which it was his duty to walk. And there is no evidence that there was any peculiar reason for the servant in the discharge of his duty, or a supposed discharge, or for self-protection, to step upon this plank when he did so.

[1] The way, then, which the servant took to his death, is not shown to have been one in the permanent structure where the servant worked, but a temporary passage over an opening incidental to the unfinished work of an independent contractor. And there is not sufficient proof to justify the conclusion that this way was adopted by the master for the use of the servant in the discharge of his service.

Hence the liability as master, if any, depended, not upon the use of this way by the servants on the premises of the master, but, if

there were such use, whether the master knew it or in the exercise of due care ought to have known it. And only after proof sufficient to charge the master with such knowledge, actual or constructive, could the ultimate question arise whether in the exercise of due care the master could and should have prevented the casualty. There is no proof of such actual knowledge; and the proof to impute knowledge must be found, if at all, in the testimony of the said Sullivan, who testifies that during the month or two that he worked there, when he saw "men" walking towards Chatham Square, they walked on the ties of the center track (on which there were no rails), and that "then" they would cross over the planks. "Q. Before the accident, have you seen flagmen and trackwalkers walking across these planks? A. Yes, sir. Q. Is that the only way you have seen them walking towards Chatham Square? A. Yes, sir. Q. And you had walked over them yourself, had you not? A. Yes, sir."

[2, 3] In the first place, this at most is but the knowledge of a coservant not imputable to the master. And, in the second place, this testimony but shows that persons walking on the structure, who naturally would walk either along tracks whereon the trains were running or along the center track, when they came to the opening and wished to continue their course, necessarily used the planks to cross the opening. But there is no proof in this testimony quoted that trackwalkers in the discharge of their duties ever took such course. Sullivan may have seen men who were employed as flagmen or trackwalkers use these planks when they wished to pass along the structure to reach the station, but that is quite different from proof that trackwalkers, when in the discharge of their duties as such or when going about those duties, were accustomed to stand upon these planks or to pass over them. Moreover, as I have said, there is undisputed testimony that the duties of the trackwalkers required them to walk along the tracks, and the preponderance of testimony is that the method of those walking in the tracks, whenever trains were worked, to avoid these trains, was to seek the girder.

The testimony does not justify the conclusion that the master in the exercise of due care ought to have known that his servants, while in his service or in seeking their places of work, were accustomed to use these planks either for standpoint or for passage, and therefore the judgment against the master cannot stand, but it and the order must be reversed and a new trial must be granted, costs to abide the event. All concur.